J-S51033-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: N.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S., MOTHER | : | No. 551 MDA 2019 |
| | : | |

Appeal from the Decree Entered February 15, 2019
in the Court of Common Pleas of Lancaster County
Orphans' Court at No(s):  161-2018,
CP-36-DP-0000187-2016

BEFORE:  PANELLA, P.J., GANTMAN, P.J.E., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED: DECEMBER 27, 2019**

S.S. ("Mother") appeals from the Decree granting the Petition filed by Lancaster County Children and Youth Social Service Agency ("the Agency"), and involuntarily terminating Mother's parental rights to her minor daughter, N.S. (born in January 2007) ("Child"), pursuant to the Adoption Act, 42 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).   We affirm.

The Orphans' Court set forth the factual and procedural history of this matter as follows:

> [Child] was born [in] January [] 2007.  [Mother] is the mother of [Child.  D.S. ("Father")] is the father of [Child].  On June 22, 2016, the Agency received its initial referral because Mother and Father were incarcerated in a county other than Lancaster[,] and three of their minor children were in Lancaster County.  The Agency caseworker went to the home [] in Quarryville, Lancaster County, Pennsylvania, and there found three individuals, J.S., D[a].S. and [Child], all of whom are children of Mother and Father.
>
> D[a].S. (then 12 years of age) and [Child] (then 9 years of age) were the subjects of the adjudicatory hearing held on August

30, 2016. J.S. (then 19 years of age) reported to the Agency caseworker that he and the two children were the only people residing in the home. J.S. confirmed that his parents were incarcerated and, prior to his incarceration, Father had lived with him, D[a].S., and [Child].

J.S. was not employed and he confirmed that neighbors had been providing food for him and his siblings. The caseworker conducted three more home visits on June 23, 24, and 28, 2018. J.S. did not have access to a vehicle in the event that the minor children, D[a].S. and [Child], needed medical care. D[a].S. and [Child] were placed with the Agency on July 1, 2016.

The family had formerly been part of the Amish community, but had been shunned by that community. D[a].S. and [Child] were being home-schooled and had never been enrolled in school. There were no medical records for D[a].S. and [Child]. The house was unfinished and J.S. had no means to support D[a].S. and [Child].

D[a].S. and [Child] are two of a total of eleven siblings. The Agency determined that J.S. was not able to meet the needs of D[a].S. and [Child]. As of the date of the August 30, 2016, adjudicatory hearing, both Mother and Father remained incarcerated. D[a].S. and [Child] were initially placed with their siblings[,] who were in placement through the Bucks County Children and Youth Agency. At the time of the adjudicatory hearing, the Agency had not prepared a child permanency plan because Bucks County had indic[a]ted they would accept a transfer of jurisdiction for D[a].S. and [Child].

At the time of the adjudicatory hearing, Father had two felony criminal charges pending in the Court of Common Pleas of Bucks County, Pennsylvania. Father's charges were conspiracy to commit statutory sexual assault of a child 11 years of age or older and endangering the welfare of children[] by a parent, guardian, or other. At the time of the adjudicatory hearing, Mother had pending a felony criminal charge [] in the Court of Common Pleas of Bucks County, Pennsylvania, for endangering the welfare of children by a parent, guardian, or other. The parents' criminal charges arose from the fact that they had "gifted" their minor daughters (other than [Child]) to an adult male, [L.K.], to serve as his wives as repayment for a debt.

Mother had moved to Bucks County in 2013 with her other [c]hildren, leaving Father with J.S., D[a].S., and [Child] in Lancaster County. Father would go back and forth between Bucks County and Lancaster County prior to his incarceration. On June 16, 2016, the Bucks County Children and Youth Social Service Agency took custody of minor siblings of J.S., D[a].S., and [Child], specifically, M.S., S[a].S., R.S., L.S., E.S., B.S., H.S., and C.S., as well as K.S. and her two young children fathered by [L.K.]. All were found to be dependent children in dependency proceedings in the Court of Common Pleas of Bucks County, Pennsylvania, excepting only K.S. (because she was an adult at the time the petition was filed).

At the December 28, 2016, disposition hearing, the court established a primary permanency goal of reunification [with] parent[s] and a concurrent permanency goal of adoption for [Child]. Mother's objectives on the [C]hild's permanency plan were: (a) to cooperate with Agency assessment upon her release from incarceration; (b) to develop an understanding of sexual victimization; (c) to improve mental health functioning to the extent that she can care for her child; (d) to remain crime free; (e) to learn and use good parenting skills; (f) to be financially stable in order to provide for herself and her child; (g) to maintain a home free and clear of hazards for herself and her child; and, (h) to maintain an ongoing commitment to her child.

As of the time of the ten months permanency review hearing held on May 16, 2017, D[a].S. and [Child] were placed at the Christ's Home for Children, which is a congregate care setting. D[a].S. and [Child] were placed at Christ's Home for Children with their other female siblings and two nieces. Christ's Home for Children is not a permanent placement for [Child]. At that time (in May[] 2017), [Child] was visiting with her Aunt S[.] and Uncle S[.] S[.] [("Foster Parents")], who had applied to become kinship care providers for her.

While they resided together at Christ's Home for Children, [Child]'s sisters treated [Child] poorly, called her mean nicknames, and excluded her from activities. [Child] always was treated as the "black sheep" in her biological family (including by her parents), who treated her as though she never belonged with them. When [Child]'s biological family was intact, [Child] was harshly punished[,] especially for not completing school work …. She would be sent to her room for days or weeks at a time, only

being allowed to leave to eat or to use the bathroom. She was never treated fairly. When [Child] resided with [] [F]ather and brothers, she was forced to sit at a separate dinner table from the rest of the family.

[Foster Parents] are part of the Amish community. Of the S[.] family, only [Foster Parents] have been loving and accepting of [Child]. [Foster Parents] were found to be acceptable by the Agency as a kinship care resource for [Child]. At the time of the permanency review hearing held on May 15, 2017, Mother had not seen [Child] for three years. Nevertheless, Mother was opposed to [Child] being placed with [Foster Parents]. Mother believed it would be better for [Child] to be placed with a resource outside the family rather than with [Foster Parents].

By Order dated and filed June 28, 2017, [Child]'s placement was modified to move her to the home of [Foster Parents], where she remained as of the October 10, 2017, permanency review hearing. At the time of the permanency review hearing held on October 10, 2017, Mother continued to be incarcerated and had been sentenced to three to seven years in prison.

As of that same time, Mother had not addressed the sexual victimization of her children or had any mental health evaluations. Mother does send letters to [Child]. It was noted at the October 10, 2017, hearing that a birth certificate had never been issued for [Child,] and there were concerns about the identity of her biological father (given the nature of the crimes with which [L.K.], Mother, and Father had been charged with and convicted of). Accordingly, the court authorized genetic testing to establish paternity. As of the time of the October 10, 2017, permanency review hearing, [Child] had embraced the Amish lifestyle while living with [Foster Parents] and was thriving in their home. [Child] had indicated she wanted to live permanently with [Foster Parents], as theirs is a home where she is accepted. As of the time of the October 10, 2017, permanency review hearing, [Foster Parents] had indicated their willingness to become a permanent resource for [Child].

Opinion *Sur* Appeal, 4/29/19, at 5-12 (citations to the record and internal paragraphing omitted).

On January 19, 2018, the Agency filed a Petition to involuntarily terminate Mother's and Father's parental rights to Child. The Orphans' Court conducted hearings on the Petition on March 1, 2018, July 19, 2018, and November 8, 2018.[1] The Agency presented the testimony of Father and Jessica Landman ("Landman"), a caseworker for the Agency. Father presented the testimony of his sons, J.S. and A.S. Both Mother[2] and Father testified on their own behalf.[3] On February 15, 2019, the Orphans' Court entered a Decree involuntarily terminating Mother's parental rights to Child.[4]

---

[1] Child was represented by her guardian *ad litem* ("GAL")*.*

[2] At the hearings on July 19, 2018, and November 8, 2018, Mother chose to proceed *pro se*, with appointed stand-by counsel. On appeal, she is represented by counsel.

[3] By Order dated March 1, 2018, the court incorporated the juvenile court proceedings pertaining to Child.

[4] The Decree also involuntarily terminated the parental rights of Father, who did not file an appeal, and has not participated in this appeal.

Mother timely filed a Notice of Appeal.[5]

On appeal, Mother raises the following issues for our review.

I. Did the court err in finding that Mother failed to use reasonable efforts and firmness to work on the goals of the Child Permanency Plan and maintain a parental relationship with the [C]hild, as Mother pursued a mental health evaluation, reached out to those charged with helping her, wrote to the [C]hild through the [A]gency case worker each month and received replies from the [C]hild?

II. Did the court err and abuse its discretion in terminating the rights of Mother, as termination of Mother's rights is not in the best interests of the [C]hild and will not promote the physical, mental, or emotional well being of the [C]hild, as the court primarily relies on the decision rendered by a[n] eleven[-]year[-]old?

III. Did the court err that [*sic*] visits with the [C]hild were never coordinated during this case, as visits would have revealed the true dynamics in the mother and child bond relationship[?]  The denial of visits prejudiced [M]other's ability to progress with the Plan and her case.

Mother's Brief at 8-9.[6]

---

[5] Mother did not contemporaneously file a concise statement of errors complained of on appeal.  On March 13, 2019, the Orphans' Court ordered Mother to file a concise statement within ten days.  Mother timely complied by mailing her concise statement from prison on March 20, 2019.  **See Thomas v. Elash**, 781 A.2d 170, 176 (Pa. Super. 2001) (holding that "a legal document is deemed filed by an incarcerated litigant, proceeding *pro se,* on the date it is delivered to the proper prison authority or deposited in the prison mailbox.").  Because no party claims prejudice as a result of Mother's procedural violation, we will not quash or dismiss her appeal.  **See In re K.T.E.L.**, 983 A.2d 745 (Pa. Super. 2009); **cf. J.P. v. S.P.**, 991 A.2d 904, 908 (Pa. Super. 2010) (holding that appellant waived all issues by failing to file a concise statement of errors complained of on appeal when directed by the trial court).

[6] While Mother stated her issues somewhat differently in her Concise Statement, we find them sufficiently preserved for this Court's review.

We will address Mother's arguments simultaneously. In her first claim, Mother contends that the Orphans' Court erred because it failed to consider the measures that Mother took to work on the goals of the Child Permanency Plan and to maintain a bond with Child. Mother's Brief at 24. Mother contends that she wrote to Child, paid for a mental health evaluation, and inquired about parenting classes in prison, but was informed no such classes were available. *Id.* at 26. Accordingly, Mother contends that the court erred by failing to consider the efforts that she undertook to reunite with Child, and argues the court improperly concluded that no services exist to assist Mother. *Id.* at 27. Mother also faults the court for terminating her parental rights when her release from prison is imminent. *Id.* at 24. Finally, Mother contends that she deserved additional time to reunite with Child because of delays in Child's dependency case. *Id.* at 27.

Next, Mother argues that the Orphans' Court abused its discretion by placing too much weight on Child's preferred outcome, *i.e.*, adoption, because Child lacked the maturity to make such a decision. *Id.* at 28. Further, Mother contends that the court improperly disregarded the letters she had exchanged with Child. *Id.* Mother also questions Child's status as "a black sheep of the family that was not bonded with her parents…." *Id.* at 29.

Finally, Mother faults the Orphans' Court for determining that Mother did not desire in-person visits with Child, and suggests that the failure to

arrange such visits prejudiced her ability to defend against the termination of her parental rights. *See id.* at 31-35.[7]

> We review these claims mindful of our well-settled standard of review:
>
> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

---

[7] We note that we could deem Mother's second and third issues waived, as she failed to support her claims with citation and discussion of relevant legal authority. *See* Pa.R.A.P. 2119(a) (stating that the argument shall include "such discussion and citation of authorities as are deemed pertinent.").

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court may affirm a decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as a consideration of Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will consider subsections 2511(a)(2) and (b),[8] which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

---

[8] In its Opinion *sur* Appeal, the Orphans' Court suggested that it terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). Opinion *Sur* Appeal, 4/19/19, at 17 (stating that "[i]nstantly, the Agency filed for termination on four grounds, one of which applies to Mother; namely, 23 Pa.C.S.A. § 2511(a)(2)."). However, we observe that the Decree includes language from subsections 2511(a)(1), (2), (5), and (8).

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002); *see also In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (explaining that "a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.").

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* A parent's vow to cooperate, after a long period of

uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340. Further, as this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Moreover, with regard to incarcerated parents, the Supreme Court has stated that

> incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d at 830-31 (some citations omitted).

In addressing Section 2511(a)(2), the Orphans' Court stated as follows:

> Mother has not been with [Child] to parent her since 2013. That Mother willingly gave her other daughters to a man for his sexual satisfaction to forgive her debt is astonishing. The court cannot

discern a course of rehabilitative treatment that would satisfactorily address this concern.

Mother and Father's act in "gifting" two of their daughters to [L.K.] in exchange for the forgiveness of a debt resulted in the parents being criminally convicted and incarcerated. Mother has been unable to parent [Child]. The record is bereft of any effort by Mother to make a good-faith effort to rehabilitate herself while she has been incarcerated.

Opinion *Sur* Appeal, 4/29/19, at 18.

Our review of the record supports the Orphans' Court's decision. Mother testified that, prior to her incarceration in June 2016, she had not seen Child in two-and-a-half years.[9]  N.T. (Permanency Review Hearing), 10/10/17, at 53-54.   Caseworker Landman confirmed that when Mother and her other

_____

[9] Mother testified as follows:

THE COURT:  So are you saying two years prior to June of 2016?  You hadn't seen [Child] for two and a half years?

[Mother]:   Yes.

THE COURT:  Okay.  Why?

[Mother]:  What's that?

THE COURT:  Why?

[Mother]:  There was no particular reason.  I believe [Father] was about his business and affairs and so were we in our place; although, [Father] did come back and forth -- or he did commute back and forth.  It's just, basically, there's no differential.

N.T. (Permanency Review Hearing), 10/10/17, at 53-54.

daughters moved to live with L.K., Child stayed behind with Father. N.T., 7/19/18, at 32. Landman also testified that Child was treated harshly and shunned within her own family, explaining that Child ate at a separate dinner table and would be sent to her room for days or weeks at a time as punishment for not completing her school work. *Id.* at 44-45. Landman was never provided a reason for the poor treatment, other than Child was viewed as "different." *Id.* at 32.[10]

Landman testified that the Agency became involved with Child in June 2016, when the Agency received an initial referral that Mother and Father were incarcerated on charges relating to Mother and Father "gifting" their daughters, other than Child, to L.K., so that they could serve as his wives. *Id.* at 29-30. The Agency conducted a home visit and determined that Child was living in the home with her brothers, Da.S. and J.S. *Id.* at 29-31. At the time, Da.S. was 12 and J.S. was 20. *Id.* at 29. J.S. was unemployed and could not provide for the basic needs of Child and Da.S. *Id.* at 31. On July 1, 2016, the Agency sought temporary custody of Child, as well as Da.S. *Id.* at 33. Child was adjudicated dependent on August 30, 2016. Order of Adjudication-Child Dependent, 8/30/16.

---

[10] When Child visited with her older siblings while in care, they continued to treat her poorly. *See* N.T., 7/19/18, at 46-47.

The Agency implemented a child permanency plan with goals that required Mother to cooperate with the Agency upon her release from prison; develop an understanding of sexual victimization; improve her mental health functioning so that she can care for Child; remain crime free; learn and use good parenting skills; become financially stable; obtain and maintain a home free and clear of hazards; and maintain an ongoing commitment to Child. *See* N.T., 7/19/18, at 34-37.

During Child's time in care, Mother wrote letters to Child regularly. *Id.* at 37. Moreover, Mother pled guilty to endangering the welfare of children on April 6, 2017, and was sentenced to a term of three to seven years in prison. *Id.* at 35. Accordingly, Mother's progress towards remaining crime-free and maintaining a commitment to Child were ongoing. *Id.* at 36-37. However, the other goals remained incomplete at the time of the termination hearing. *Id.* at 34-37. Mother, for her part, testified that she reached out to the Agency to determine how to make progress on the permanency plan. N.T., 11/8/18, at 54. Mother contended that the Agency made no effort towards re-unifying her with Child, and that she was restricted from completing her goals due to her incarceration. *Id.* at 55.

Here, the court credited testimony establishing that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272.

Moreover, Mother cannot or will not remedy this situation. Accordingly, termination pursuant to Section 2511(a)(2) was proper.

Next, regarding Section 2511(b), the court inquires whether the termination of the parent's parental rights would best serve the developmental, physical and emotional needs and welfare of Child. ***See In re C.M.S.***, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***Id.*** at 1287 (citation omitted). The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***Id.***

> With regard to Section 2511(b), this Court has stated as follows:
>
> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.

***In re Z.P.***, 994 A.2d at 1121 (citations omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***Id.*** (internal citations omitted). This Court has explained that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to section

2511(b).  ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008)

(*en banc*).

The Orphans' Court, addressing Section 2511(b), concluded that

termination of Mother's parental rights best meets the needs and welfare of

Child, explaining as follows:

> The [GAL] represented to the court that [Child] indicated that she adamantly wishes to be adopted by her kinship family, [Foster Parents], which certainly speaks both to the diminished quality of the bond between [Child] and her parents from the [C]hild's perspective and also to the negligible negative effect that the severance of that nominal bond would have on [Child].  There was consistent testimony that [Child] was treated as the "black sheep" of her biological family (including her parents) while that family was intact, which was an unfortunate practice to say the least[,] and one which speaks to the quality of the bond between [Child] and her parents from her parent's perspective.  The parents opposed termination because of the limited education [Child] will receive while being raised in the Amish community.  This concern is a small one in comparison to the benefits [Child] has, and will, receive by being taken into a loving family to whom she is related by blood.  The best interest of [Child] will be served by severing the parental relationship and enabling her permanent integration into the family which has already embraced her.

Opinion *Sur* Appeal, 4/19/19, at 19-20.

Our review of the record confirms that the Orphans' Court did not abuse

its discretion in involuntarily terminating Mother's parental rights pursuant to

Section 2511(b).  As Mother conceded, she did not see Child for two-and-a-

half years prior to her arrest in June 2016.  N.T. (Permanency Review

Hearing), 10/10/17, at 53-54.  Further, Child's family treated her poorly and

excluded Child both before and after Child was placed in care.  Father

explained that Child was "very much proud of herself, ignorant, and she did

some things that were not good." N.T., 11/8/18, at 23. Further, Father observed, "[n]obody enjoyed being around [Child]. And so for that reason, we actually separated her from her sisters at that time."[11] *Id.* Following Mother's arrest, and as credited by the court, Mother and Child wrote letters to each other.[12]

Primarily, the testimony objecting to terminating Mother's parental rights pursuant to Section 2511(b) related to the Amish culture and the assertion that Child's education would be limited. *Id.* at 7-16, 25-26, 54. Further, Father testified that Foster Parents told his children that they "are going to hell because they're leaving the Amish…." *Id.* at 21. Father asserted that it was in Child's best interest to reunite with Mother upon Mother's release from prison. *Id.* at 28-29.

Landman testified that Child adjusted well to Amish culture and is intelligent, outgoing, and social. N.T., 7/19/18, at 41. Landman also confirmed that Child does well in school and that Foster Parents are an adoptive resource. *Id.* at 41, 48. Landman opined that it is in Child's best interests to terminate Mother's parental rights and to have Child adopted into a stable and permanent home. *Id.* at 42. Further, Child's GAL stated that he

_____

[11] Father explained that Child was born with "[a] bad spirit." N.T., 11/8/18, at 37. However, Father also testified that Child became more good-natured in the year prior to his incarceration. *Id.* at 24.

[12] Mother testified that Child writes her "very lively letters." N.T., 11/8/18, at 54.

- 17 -

met with Child, who had "no doubt in her mind" that she wants to be adopted. N.T., 11/8/18, at 47. Child understood the concept of adoption, and stated that she wants to be adopted by Foster Parents as "she feels supported by the community she's in." *Id.* Child appeared relaxed, talkative, content, and comfortable with Foster Parents, and seemed like she belonged. *Id.* The GAL believed it was in Child's best interest to involuntarily terminate Mother's and Father's parental rights. *Id.* at 48. The credited testimony supports the Orphans' Court's conclusion that termination of Mother's parental rights best serves the needs and welfare of Child.

Moreover, Mother's argument that she was not permitted to visit Child seeks to improperly require the Orphans' Court to consider whether the Agency provided reasonable efforts towards reunification. *See In the Interest of: D.C.D., a Minor*, 105 A.3d 662, 672-74, 676 (Pa. 2014) (explaining that although a court may consider the "provision or absence of reasonable efforts," the Adoption Act does not require a court "to consider the reasonable efforts provided to a parent prior to termination of parental rights."). While Mother testified that she would like visits with Child, she did not file a formal request for visitation in Child's dependency action, and had not seen Child for several years prior to the termination proceedings.[13]

---

[13] By Order dated January 24, 2019, the court changed the permanent placement goal for Child to adoption. *See* Order, 1/24/19. There is no indication in the record that Mother appealed the goal change Order.

Further, the court did not improperly rely on Child's preferred outcome. Rather, the record reflects that the court considered the totality of the evidence presented at the hearing and concluded that termination of Mother's parental rights was appropriate. As we have repeatedly stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.P.*, 994 A.2d at 1125 (citation omitted). Instead, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted). The court did not abuse its discretion in involuntarily terminating Mother's parental rights pursuant to Section 2511(b).

For the foregoing reasons, we affirm the Decree involuntarily terminating Mother's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/27/2019